# Exhibit A

# Case Summary

**Case Number:** MER L-000261-21

**Case Caption:** Katz Joshua Vs American Council Of Learned S

| | | |
|---|---|---|
| **Court:** Civil Part | **Venue:** Mercer | **Case Initiation Date:** 02/04/2021 |
| **Case Type:** Contract/Commercial Transaction | **Case Status:** Active | **Jury Demand:** 6 Jurors |
| **Case Track:** 2 | **Judge:** Douglas H Hurd | **Team:** 50 |
| **Original Discovery End Date:** | **Current Discovery End Date:** | **# of DED Extensions:** 0 |
| **Original Arbitration Date:** | **Current Arbitration Date:** | **# of Arb Adjournments:** 0 |
| **Original Trial Date:** | **Current Trial Date:** | **# of Trial Date Adjournments:** 0 |
| **Disposition Date:** | **Case Disposition:** Open | **Statewide Lien:** |

**Plaintiffs**
**Joshua Katz**

| | | |
|---|---|---|
| **Party Description:** Individual | | **Attorney Name:** Jonathan Stuart Roth |
| **Address Line 1:** | **Address Line 2:** | **Attorney Bar ID:** 028012006 |
| **City:** **State:** NJ | **Zip:** 00000 | **Phone:** |

**Attorney Email:** JROTH@GOLDSTEINLP.COM

**Defendants**
**American Council Oflearned So**

| | | |
|---|---|---|
| **Party Description:** Business | | **Attorney Name:** |
| **Address Line 1:** | **Address Line 2:** | **Attorney Bar ID:** |
| **City:** **State:** NJ | **Zip:** 00000 | **Phone:** |

**Attorney Email:**

### Case Actions

| Filed Date | Docket Text | Transaction ID | Entry Date |
|---|---|---|---|
| 02/04/2021 | Complaint with Jury Demand for MER-L-000261-21 submitted by ROTH, JONATHAN STUART, GOLDSTEIN LAW PARTNERS, LLC on behalf of JOSHUA KATZ against AMERICAN COUNCIL OF LEARNED SO | LCV2021268193 | 02/04/2021 |
| 02/05/2021 | TRACK ASSIGNMENT Notice submitted by Case Management | LCV2021274179 | 02/05/2021 |
| 02/11/2021 | PROOF OF MAILING submitted by ROTH, JONATHAN, STUART of GOLDSTEIN LAW PARTNERS, LLC on behalf of JOSHUA KATZ against AMERICAN COUNCIL OF LEARNED SO | LCV2021332102 | 02/11/2021 |

**GOLDSTEIN LAW PARTNERS**
Jonathan Roth, Esq.
Attorney ID: 028012006
11 Church Road
Hatfield, PA
(610) 949-0444
jroth@goldsteinlp.com
*Attorneys for Plaintiff*

| | | |
|---|---|---|
| JOSHUA KATZ | : | SUPERIOR COURT OF NEW JERSEY |
| | : | MERCER COUNTY |
| Plaintiff, | : | |
| | : | DOCKET NO.: |
| v. | : | |
| | : | |
| AMERICAN COUNCIL OF LEARNED SOCIETIES | : | **PLAINTIFF'S COMPLAINT** |
| | : | |
| Defendant. | : | |

## COMPLAINT

Plaintiff, Joshua Katz, by and through his undersigned attorneys, by way of complaint against the Defendant, hereby states as follows:

### INTRODUCTION

1. Plaintiff Joshua Katz sues for breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, and equitable estoppel to recover from the American Council of Learned Societies ("ACLS"), which stripped him of his position as an ACLS delegate to the Union Académique Internationale ("UAI") solely because he expressed views that, although fully reasonable and protected by ordinary principles of academic freedom, offend the ideological sensibilities of some in academia. While ACLS

proudly proclaims that it is "committed to fostering diversity," ACLS in fact cancelled Plaintiff's contract due only to his deviation from a currently fashionable viewpoint, and Plaintiff has been damaged as a result.

## PARTIES

2. Plaintiff Joshua Katz is the Cotsen Professor in the Humanities at Princeton University, where he is a tenured professor of Classics. Plaintiff resides in Princeton, New Jersey.

3. Defendant American Council of Learned Societies ("ACLS") is a 501(c)(3) nonprofit organization with a principal place of business at 633 Third Avenue, New York, New York.

## JURISDICTION AND VENUE

4. Jurisdiction is proper over Defendant because Plaintiff's claims arise from Defendant's communications and contacts with Plaintiff, a New Jersey resident, concerning his contract with Defendant.

5. Venue is proper pursuant to R. 4:3-2(a) because it lies where the cause of action arose and where Plaintiff is a resident.

## FACTS

6. Defendant ACLS is a federation of 75 member organizations, each of which is a professional organization for humanities scholars and related social scientists. Its mission is to "support scholarship in the humanities and social sciences and to advocate for the centrality of the humanities in the modern world." ACLS represents the United States in the UAI, a "global organization of national academies in the fields of the humanities and

social sciences" whose "aims are to initiate, recognize, foster and fund basic long-term international research projects."

7. ACLS has two delegates who represent the United States at the UAI's general assembly.

8. Although delegates do not receive monetary payments for their service, there is significant consideration in the form most important to academic careers: recognition and prestige.

9. Academia is unlike many other professions, where compensation is the primary measure of an employee's success and value in his or her chosen field. Honorary positions such as the UAI delegate position play a significant role in the career trajectory of an academic, with appointments such as this leading to greater visibility, prestige, and, ultimately, to more such opportunities.

10. For example, Madeline Caviness, who was appointed as an ACLS delegate to the UAI in 1984 and stepped down last year, ultimately served as the President of the UAI from 1998 to 2001.

11. While compensation is not the primary measure of an academic's success, outside appointments and honors also play a significant role in the degree to which an academic is valued by – and thus, compensated by – his or her institution.

12. On February 19, 2020, ACLS President Joy Connolly sent Plaintiff a letter asking him to serve as one of ACLS's two delegates to the UAI.

13. Connolly's letter made clear that this would likely be a long-term appointment, noting that one of the two former delegates — both of whom stepped down this year — had "served as a delegate for over thirty years."

14. Plaintiff followed up with Connolly to inquire about the dates of ACLS and UAI meetings and other obligations so that he could "get them on [his] calendar," as well as the calendar of his department chair at Princeton.

15. On February 20, 2020, Plaintiff wrote to the chair of the Princeton Department of Classics, Michael Flower, to inform him of ACLS's offer and to obtain Flower's approval for Plaintiff to miss time for ACLS and UAI meetings.

16. Calling the offer a "huge honor," Flower approved Plaintiff's request for the necessary time off and told Plaintiff he "should accept it if you would like to assume this role."

17. On February 21, 2020, Plaintiff wrote to Sandra Bradley, ACLS's Director of Governance and Society Relations, to ask when his official term as a UAI delegate would begin.

18. Sandra Bradley wrote to Plaintiff on February 26, 2020, to inform him that "a July 1 [start] date would work best."

19. On March 9, 2020, Plaintiff sent a letter to Joy Connolly informing her that he was "delighted to accept" the offer "to serve as one of ACLS's delegates to the Union Académique Internationale beginning on July 1st."

20. Connolly responded by email on March 9, 2020, writing "Excellent news on a dismal and anxious day around the world. Thank you, Josh!" Connolly conveyed no requirement that Plaintiff conform to any political viewpoint in order to serve, nor did she require Plaintiff to pass any ideological litmus test.

21. As of July 1, 2020, Plaintiff became one of ACLS's delegates to the UAI by mutual meeting of the minds of the parties.

22. On July 4, 2020, in the wake of the racial tensions that roiled the country after George Floyd's killing in May 2020, a large group of Princeton faculty submitted a manifesto to Princeton's leadership (the "Faculty Letter"). The Faculty Letter asked the university to "take immediate concrete and material steps to openly and publicly acknowledge the way that anti-Black racism, and racism of any stripe, continue to thrive on its campus."

23. The Faculty Letter contained numerous requests, including extra pay to reward the "invisible work" done by faculty of color; the creation of a faculty committee to "oversee the investigation and discipline of racist behaviors, incidents, research, and publication"; and the issuance of a formal apology to the members of the Black Justice League ("BJL").

24. The BJL was a by-then defunct student group that had, in 2016-17, engaged in activism on campus that Plaintiff believed unfairly targeted, harassed, and sought to intimidate students — notably including students of color — who dissented from the group's views.

25. On July 8, 2020, Plaintiff published a response in Quillette to the Faculty Letter entitled "A Declaration of Independence from a Princeton Professor."

26. In his response, Plaintiff explained that while he supported a number of the proposals in the Faculty Letter aimed at making Princeton more accessible to underprivileged students and underrepresented minorities, he believed that some of the proposals – including paying extra salary on the basis of race and creating a committee to discipline allegedly "racist" research and publication – "would lead to civil war on campus and erode even further public confidence in how elite institutions of higher education operate."

27. Plaintiff also objected to the demand that Princeton apologize to the BJL, which he described as "a small local terrorist organization that made life miserable for the many (including the many black students) who did not agree with its members' demands."

28. Plaintiff's characterization of the BJL was based on two things. First, Plaintiff was responding to the group's gross mistreatment of, and attempts to intimidate, a black Princeton student who disagreed with the group's aims. As Plaintiff explained in a follow-up to his Quillette article, the group "went after [this individual] with particular vigor, verbally vilifying her in public at every possible opportunity, calling her all sorts of unsavory epithets and accusing her of 'performing white supremacy.'" Second, in 2020, a former undergraduate who had been an active member of the BJL held an Instagram Live "struggle session" in which former BJL members berated and humiliated two students, calling for their job offers to be rescinded for expressing views with which group members disagreed, and threatening to take steps to make that happen.

29. The BJL's cruel harassment of the dissenting student had drawn the attention of the Princeton administration: the student expressed her concerns to a Princeton vice president who informed her that the BJL's actions were unacceptable and promised to ensure that group members knew such conduct would not be tolerated.

30. While BJL members never faced discipline for their actions, Plaintiff's Quillette article – in a campus climate where dissenting from the prevailing orthodoxy on issues of group identity is treated as blasphemy – prompted widespread calls for Princeton to revoke his tenure and terminate his employment.

31. To his credit, Princeton president Chris Eisgruber publicly confirmed that Plaintiff's expression was protected by Princeton's commitment to free speech and could not be punished.

32. On July 14, 2020, the Editorial Board of the Wall Street Journal published an editorial about the "speech police at Princeton," expressing concern that "the cancel culture doesn't need to get [Plaintiff] fired to succeed. It succeeds by making him an outcast in his own university, and intimidating into silence others on campus who might agree."

33. Indeed, numerous Princeton students, faculty, and alumni, as well as people unconnected to Princeton, privately expressed to Plaintiff that they agreed with him but were too fearful for their own careers to say so publicly. One such individual wrote that "If I admitted now what I really thought on this and a number of other topics, I would be finished in academic life." Another wrote to say that "As a junior tenure-track professor, I sympathize with your message, but I cannot afford the luxury to support it openly; hence why this email is regretfully unsigned."

34. The Wall Street Journal's prediction that the "cancel culture" would succeed despite Plaintiff retaining his job at Princeton was unfortunately accurate. The graduate student Plaintiff was supposed to mentor was reassigned to another faculty member. The Director of Graduate Studies for Classics wrote individually to each graduate student in the department about the "pain" allegedly caused by Plaintiff's article, which is the presumptive cause of the fact that only one graduate student enrolled in Plaintiff's graduate seminar in Fall 2020. Ultimately, the effort to cancel Plaintiff spread beyond the university to ACLS.

35. On September 14, 2020, ACLS president Joy Connolly joined in the witch hunting of Plaintiff for opposing the extremist (and in some particulars unlawful) proposals of the Princeton faculty and for criticizing the BJL. Connolly wrote to Plaintiff informing him that because "[y]our article in Quillette this summer and follow-up statement took a strong personal stance on racism at Princeton, and it drew a great deal of attention on social media and elsewhere … I have decided to ask another scholar to serve as ACLS's UAI representative."

36. Connolly wrote this even as she acknowledged that "we have made encouraging public engagement by leading scholars one of our priorities at ACLS."

37. Indeed, Connolly and others affiliated with ACLS have also publicly taken strong personal stances on racism, as evidenced by, among other things, a September 30, 2020 panel Connolly hosted for ACLS entitled "A Discussion on Race & Racism."

38. It is clear, therefore, that ACLS's termination of Plaintiff as a delegate was not based on the *content* of his speech – individuals affiliated with ACLS are permitted to take strong personal stances on racism – but rather the *viewpoint* he expressed. Viewpoint discrimination is rightly considered one of the most poisonous forms of censorship.

39. Connolly's September 14, 2020 letter also informed Plaintiff that because ACLS had not yet confirmed the participation of its second UAI delegate – a delay occasioned by COVID-19 – "our March invitation to you is not public knowledge and has not been announced to the UAI leadership or staff." In other words, rather than acknowledge that it was terminating Plaintiff as a delegate over the viewpoints he had expressed, ACLS chose to pretend that he had never been appointed in the first place.

40. This came as a complete shock to Plaintiff, who had formally accepted ACLS's February 19 offer and negotiated a July 1 start date and who was, pursuant to the parties' agreement, a UAI delegate as of that date.

41. Defendant's actions have caused Plaintiff substantial damage, lessened his reputation, and reduced his potential for future advancement which has caused him to incur monetary damages.

## FIRST COUNT
### (Breach of Contract)

42. Plaintiff incorporates the allegations contained in all preceding paragraphs as if set forth fully herein.

43. ACLS, acting through its president, made an express offer to Plaintiff on February 19, 2020.

44. Plaintiff formally accepted ACLS's offer on March 9, 2020.

45. For his service, Plaintiff received consideration in the form of expanded professional opportunities, including but not limited to speaking and publishing opportunities as well as merit salary increases.

46. ACLS breached its contract with Plaintiff on September 14, 2020, by informing him that it was appointing another delegate in his place.

47. ACLS's breach of contract has damaged Plaintiff. The termination of his delegate position – of which he had already informed his department chair and others – has caused Plaintiff significant professional humiliation and has lowered his stature in the eyes of his employer, costing him professional opportunities both within and outside of the university and affecting his future compensation at the university.

## SECOND COUNT
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

48. Plaintiff incorporates the allegations contained in all preceding paragraphs as if set forth fully herein.

49. Given ACLS's commitment to the dissemination of knowledge, and its employees' public expression of views on race and racism, Plaintiff had no reason to expect that his position as a delegate limited his ability to express his viewpoint on said issues.

50. ACLS acted in bad faith by terminating Plaintiff as a delegate in response to his expression of opinion on a matter of public concern, when – in the words of ACLS's own president – public engagement by leading scholars is a priority at ACLS.

51. As a proximate result of Defendant's actions, Plaintiff has been damaged -- Defendant's actions have caused Plaintiff significant professional humiliation and has lowered his stature in the eyes of his employer, costing him professional opportunities both within and outside of the university and affecting his future compensation at the university.

## THIRD COUNT
### (Promissory Estoppel)

52. Plaintiff incorporates the allegations contained in all preceding paragraphs as if set forth fully herein.

53. Defendant made a clear and definite promise to Plaintiff when it offered him the position of ACLS's delegate to the UAI.

54. Defendant expected that Plaintiff would rely on its promise.

55. Plaintiff reasonably relied on Defendant's promise when he advised the chair of the Princeton Department of Classics that he was ACLS's delegate to the UAI.

56. Plaintiff incurred a detriment in reliance of the Defendant's promise.

57. As a proximate result of Defendant's actions, Plaintiff has been damaged – Defendant's actions have caused Plaintiff significant professional humiliation and has lowered his stature in the eyes of his employer, costing him professional opportunities both within and outside of the university and affecting his future compensation at the university.

### FOURTH COUNT
**(Equitable Estoppel)**

58. Plaintiff incorporates the allegations contained in all preceding paragraphs as if set forth fully herein.

59. Defendant represented to Plaintiff that he would serve in the position of ACLS's delegate to the UAI.

60. Defendant made this representation to Plaintiff with the expectation that it would induce action on the Plaintiff's part. that Plaintiff would rely on its promise.

61. Plaintiff relied on Defendant's promise, to his own detriment.

62. As a proximate result of Defendant's actions, Plaintiff has been damaged – Defendant's actions have caused Plaintiff significant professional humiliation and has lowered his stature in the eyes of his employer, costing him professional opportunities both within and outside of the university and affecting his future compensation at the university.

### PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff, hereby demands Judgment against the Defendant as follows:

    A. Specific Performance;

    B. Compensatory Damages;

    C. Consequential Damages;

    D. Interest and cost of suit; and

E. Such other, further and different relief as the Court may deem just, equitable and proper under the circumstances.

By: _____
Jonathan Roth, Esq.
**GOLDSTEIN LAW PARTNERS**
11 Church Road
Hatfield, PA
(610) 949-0444
*Attorneys for Plaintiff*

Dated: February 3, 2021

## DESIGNATION OF TRIAL COUNSEL

In accordance with R. 4:25-4, Jonathan Roth, Esq. is hereby designated as trial counsel for the Plaintiff.

By: _____
Jonathan Roth, Esq.
**GOLDSTEIN LAW PARTNERS**
11 Church Road
Hatfield, PA
(610) 949-0444
*Attorneys for Plaintiff*

Dated: February 3, 2021

## RULE 4:5-1(b)(2) CERTIFICATION

I, Jonathan Roth, Esq., certify pursuant to Rule 4:5-1 that, to the best of m knowledge, information, and belief, the matter in controversy is not the subject of any other action or arbitration proceeding. now or contemplated and that no other parties should be joined in this action pursuant to Rule 4:28.

By: _____
Jonathan Roth, Esq.
**GOLDSTEIN LAW PARTNERS**
11 Church Road
Hatfield, PA
(610) 949-0444
*Attorneys for Plaintiff*

Dated: February 3, 2021

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues so triable as a matter of right.

By: _____
Jonathan Roth, Esq.
**GOLDSTEIN LAW PARTNERS**
11 Church Road
Hatfield, PA
(610) 949-0444
*Attorneys for Plaintiff*

Dated: February 3, 2021

## RULE 4:5-1(b)(3) CERTIFICATION

I, Jonathan Roth certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).

By: _____
Jonathan Roth, Esq.
**GOLDSTEIN LAW PARTNERS**
11 Church Road
Hatfield, PA
(610) 949-0444
*Attorneys for Plaintiff*

Dated: February 3, 2021

# Civil Case Information Statement

**Case Details: MERCER | Civil Part Docket# L-000261-21**

**Case Caption:** KATZ JOSHUA  VS AMERICAN COUNCIL OF  LEARNED S
**Case Initiation Date:** 02/04/2021
**Attorney Name:** JONATHAN STUART ROTH
**Firm Name:** GOLDSTEIN LAW PARTNERS, LLC
**Address:** 11 CHURCH RD
HATFIELD PA 19440
**Phone:** 6109490444
**Name of Party:** PLAINTIFF : Katz, Joshua
**Name of Defendant's Primary Insurance Company**
(if known): Unknown

**Case Type:** CONTRACT/COMMERCIAL TRANSACTION
**Document Type:** Complaint with Jury Demand
**Jury Demand:** YES - 6 JURORS
**Is this a professional malpractice case?**  NO
**Related cases pending:** NO
**If yes, list docket numbers:**
**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO

**Are sexual abuse claims alleged by: Joshua Katz?** NO

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE**
**CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION**

**Do parties have a current, past, or recurrent relationship?** YES

**If yes, is that relationship:** Business

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
   **If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
   **If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** NO  **Title 59?** NO  **Consumer Fraud?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

02/04/2021                                                                        /s/ JONATHAN STUART ROTH
Dated                                                                                                              Signed

```
MERCER COUNTY COURTHOUSE
CIVIL CASE MANAGMENT OFFICE
175 SOUTH BROAD ST P O BOX 8068
TRENTON          NJ 08650-0068
                                    TRACK ASSIGNMENT NOTICE
COURT TELEPHONE NO. (609) 571-4200
COURT HOURS  8:30 AM - 4:30 PM

                          DATE:    FEBRUARY 04, 2021
                          RE:      KATZ JOSHUA   VS AMERICAN COUNCIL OF   LEARNED S
                          DOCKET:  MER L -000261 21

     THE ABOVE CASE HAS BEEN ASSIGNED TO:  TRACK 2.

     DISCOVERY IS   300 DAYS AND RUNS FROM THE FIRST ANSWER OR 90 DAYS
FROM SERVICE ON THE FIRST DEFENDANT, WHICHEVER COMES FIRST.

     THE PRETRIAL JUDGE ASSIGNED IS:  HON DOUGLAS H. HURD

       IF YOU HAVE ANY QUESTIONS, CONTACT TEAM     050
 AT:  (609) 571-4200 EXT 74432.

     IF YOU BELIEVE THAT THE TRACK IS INAPPROPRIATE YOU MUST FILE A
 CERTIFICATION OF GOOD CAUSE WITHIN 30 DAYS OF THE FILING OF YOUR PLEADING.
     PLAINTIFF MUST SERVE COPIES OF THIS FORM ON ALL OTHER PARTIES IN ACCORDANCE
WITH  R.4:5A-2.
                          ATTENTION:
                                    ATT: JONATHAN S. ROTH
                                    GOLDSTEIN LAW PARTNERS, LLC
                                    11 CHURCH RD
                                    HATFIELD           PA 19440


ECOURTS
```

**GOLDSTEIN LAW PARTNERS**
Jonathan Roth, Esq.
Attorney ID: 028012006
11 Church Road
Hatfield, PA
(610) 949-0444
jroth@goldsteinlp.com
*Attorneys for Plaintiff*

| | | |
|---|---|---|
| JOSHUA KATZ | : | SUPERIOR COURT OF NEW JERSEY |
| | : | MERCER COUNTY |
| Plaintiff, | : | |
| | : | DOCKET NO.: MER-L-000261-21 |
| v. | : | |
| AMERICAN COUNCIL OF LEARNED SOCIETIES | : | **CERTIFICATE OF SERVICE** |
| Defendant. | : | |

Jonathan Roth, of full age, certifies as follows:

1. On February 9, 2021, I sent, via certified mail, return receipt requested, Plaintiff's complaint, summons, and a transmittal letter to the Defendant at the following address:

> AMERICAN COUNCIL OF LEARNED SOCIETIES
> 633 Third Avenue
> 8TH Floor
> New York, New York 10017-6706

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: February 11, 2021

_____
Jonathan Roth