NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOSHUA KATZ,<br><br>    Plaintiff,<br><br> v.<br><br>AMERICAN COUNCIL OF LEARNED SOCIETIES,<br><br>    Defendant. | Civ. No. 21-4306<br><br>**OPINION** |

THOMPSON, U.S.D.J.

## **INTRODUCTION**

This matter comes before the Court upon the Motion to Dismiss filed by Defendant American Council of Learned Societies ("ACLS"). (ECF No. 13.) Plaintiff Joshua Katz ("Plaintiff") opposes. (ECF No. 19.) The Court has decided the Motion based on the written submissions of the parties and without oral argument, pursuant to Local Civil Rule 78.1(b). For the reasons stated herein, the Motion to Dismiss (ECF No. 13) is granted.

## **BACKGROUND**

**I. Factual Background**

This is a contract or quasi-contract case. The parties dispute whether they formed a contract. Plaintiff lives in New Jersey and is a tenured Classics professor at Princeton University. (Compl. ¶ 2, ECF No. 1-1.) ACLS is a nonprofit organization incorporated in Washington, D.C. with its principal place of business in New York. (Def.'s Mot. to Dismiss at 1–2, ECF No. 13-6.) ACLS is a "federation of 75 member organizations, each of which is a professional organization

1

for humanities scholars and related social scientists." (Compl. ¶ 6.) ACLS represents the United States in the Union Académique Internationale ("UAI"), a "global organization of national academies in the fields of the humanities and social sciences" that aims to promote international research projects. (*Id.*) Two delegates from ACLS represent the United States in the UAI's general assembly. (*Id.* ¶ 7.) Delegates are not paid, but they allegedly receive recognition, visibility, and prestige. (*Id.* ¶¶ 8–9.)

On February 19, 2020, ACLS President Joy Connolly ("Connolly") sent Plaintiff a letter asking him to serve as one of ACLS's two delegates to the UAI. (*Id.* ¶ 12.) Connolly's letter noted that "one of the two former delegates – both of whom stepped down [last] year – had 'served as a delegate for over thirty years.'" (*Id.* ¶ 13.) Connolly also stated that delegates to the UAI should, among other things, have "an understanding of long-term collaborative projects" and attend the UAI's "biennial[]" general assembly. (Def.'s Ex. 1, ECF No. 13-2.) Plaintiff "followed up with Connolly to inquire about the dates of ACLS and UAI meetings and other obligations so that he could 'get them on [his] calendar,' as well as the calendar of his department chair at Princeton." (Compl. ¶ 14.)

On February 20, 2020, Plaintiff wrote to the chair of the Princeton Department of Classics, "to obtain [his] approval for Plaintiff to miss time for ACLS and UAI meetings," of which the chair approved, calling the offer a "huge honor." (*Id.* ¶¶ 15–16.)

Plaintiff wrote to Sarah Bradley, ACLS's Director of Governance and Society Relations, to ask when his term as a UAI delegate would begin. (*Id.* ¶ 17.) On February 26, 2020, she replied that "a July 1 [start] date would work best." (*Id.* ¶ 18.) On March 9, 2020, Plaintiff wrote a letter to Connolly that he was "delighted to accept" the offer to serve as a delegate "beginning on July 1st." (*Id.* ¶ 19; Def.'s Ex. 2, ECF No. 13-3.) Connolly wrote back, "[e]xcellent news on a

2

dismal and anxious day around the world. Thank you, Josh!" (Compl. ¶ 20.)

On July 4, 2020, in the "wake of the racial tensions" after George Floyd's killing in May 2020, a group of Princeton faculty members submitted a letter (the "Faculty Letter") to Princeton's leadership. (*Id.* ¶ 22.) The Faculty Letter asked the university to take certain steps to "acknowledge the way that anti-Black racism, and racism of any stripe, continue to thrive on its campus." (*Id.*) The Faculty Letter also contained numerous requests: "extra pay to reward the 'invisible work' done by faculty of color"; the creation of a committee to oversee investigations and discipline of "racist behaviors, incidents, research, and publication"; and the issuance of a formal apology to the members of the Black Justice League ("BJL"). (*Id.* ¶ 23.) BJL was a "defunct student group that had, in 2016–17, engaged in activism on campus that Plaintiff believed unfairly targeted, harassed, and sought to intimidate students . . . who dissented from the group's views." (*Id.* ¶ 24.)

On July 8, 2020, Plaintiff published a response to the Faculty Letter in an online journal called *Quillette* titled, "A Declaration of Independence from a Princeton Professor." (*Id.* ¶ 25.) In the letter, Plaintiff expressed support for several of the proposals in the Faculty Letter, but suggested that others, such as extra pay and the creation of a committee to discipline allegedly racist research and publications, "would lead to civil war on campus and erode even further public confidence in how elite institutions of higher education operate." (*Id.* ¶ 26.) Plaintiff also objected to the demand for an apology to BJL, which he described as "a small terrorist organization that made life miserable for the many (including the many black students) who did not agree with its members' demands." (*Id.* ¶ 27.)

In a "follow up" statement to his *Quillette* article, Plaintiff explained that BJL "went after" a Black student who "disagreed with the group's aims." (*Id.* ¶ 28.) According to Plaintiff,

3

BJL "verbally villif[ied] [the student] in public at every possible opportunity, calling her all sorts of unsavory epithets and accusing her of 'performing white supremacy.'" (*Id.*) Plaintiff also alleges that, in 2020, a member of BJL held an Instagram Live "struggle session" in which BJL members "berated and humiliated two students, calling for their job offers to be rescinded . . . and threatening to take steps to make that happen." (*Id.*) Plaintiff's *Quillette* article prompted widespread calls for revocation of his tenure and termination of his employment. (*Id.* ¶ 30.)

On September 14, 2020, Connolly wrote to Plaintiff, informing him that his "article in [*Quillette*] . . . and follow-up statement took a strong personal stance on racism at Princeton, and it drew a great deal of attention on social media and elsewhere." (*Id.* ¶ 35.) Connolly informed Plaintiff that she had decided to ask a different individual to serve as ACLS's UAI delegate. (*Id.*) This "came as a complete shock to Plaintiff," who believes that he formally accepted ACLS's February 19, 2020 offer, negotiated a July 1, 2020 start date, and "became one of ACLS's delegates to the UAI" as of that date. (*Id.* ¶¶ 21, 40.)

## II.   Procedural History

Plaintiff filed the Complaint in the Superior Court of New Jersey in Mercer County on February 4, 2021. (*See* Compl. at 1.) On March 5, 2021, ACLS removed the case to this Court. (ECF No. 1.) Plaintiff alleges four counts: (1) breach of contract (Compl. ¶¶ 42–47); (2) breach of the implied covenant of good faith and fair dealing (*id*. ¶¶ 48–51); (3) promissory estoppel (*id*. ¶¶ 52–57); and (4) equitable estoppel (*id*. ¶¶ 58–62).

On April 2, 2021, ACLS filed a Motion to Dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) or, in the alternative, for failure to state a claim pursuant to Rule 12(b)(6). (Def.'s Mot. to Dismiss at 9.) Plaintiff filed an Opposition (ECF No. 19), and ACLS filed a Reply (ECF No. 20). With permission of the Court, Plaintiff filed a Sur-Reply. (ECF Nos.

4

21-3, 22.) ACLS's Motion to Dismiss is presently before the Court.

## LEGAL STANDARD

"A federal court sitting in New Jersey has jurisdiction over parties to the extent provided under New Jersey state law." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 96 (3d Cir. 2004) (citing Fed. R. Civ. P. 4(e)). New Jersey's long-arm statute permits the exercise of personal jurisdiction "to the uttermost limits permitted by the United States Constitution." *Mesalic v. Fiberfloat Corp.*, 897 F.2d 696, 698 (3d Cir. 1990). Therefore, for a New Jersey court to exercise jurisdiction over a non-resident defendant, the defendant must have "certain minimum contacts with [New Jersey] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted).

When a defendant moves to dismiss a complaint for lack of personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure, "the plaintiff bears the burden of showing that personal jurisdiction exists." *Marten v. Godwin*, 499 F.3d 290, 295–96 (3d Cir. 2007); *see also Cerciello v. Canale*, 563 F. App'x 924, 925 n.1 (3d Cir. 2014) (quoting *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 142 (3d Cir. 1992)) (noting that the plaintiff bears the burden to demonstrate personal jurisdiction by a preponderance of the evidence). "To meet that burden, [the plaintiff] must 'establish[] jurisdictional facts through sworn affidavits or other competent evidence.'" *Cerciello*, 563 F. App'x at 925 n.1 (quoting *Miller*, 384 F.3d at 101 n.6). "In other words, 'bare pleadings alone' are insufficient to withstand a motion to dismiss for lack of personal jurisdiction." *Id.* Where the court does not hold an evidentiary hearing, "the plaintiff need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." *Miller*, 384 F.3d at 97.

5

## DISCUSSION

### I. Personal Jurisdiction

There are two types of personal jurisdiction: general and specific. *See Daimler AG v. Bauman*, 571 U.S. 117, 118 (2014). "General jurisdiction is based upon the defendant's 'continuous and systematic' contacts with the forum and exists even if the plaintiff's cause of action arises from the defendant's non-forum related activities." *Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001). "[S]pecific jurisdiction is present only if the plaintiff's cause of action arises out of a defendant's forum-related activities." *Id.*

### II. General Jurisdiction

A court may exercise general jurisdiction over a defendant whose affiliations with the state "are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Daimler*, 571 U.S. at 139 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). Plaintiff concedes that "[t]here is no need to address ACLS's argument against general jurisdiction, as no allegations in the Complaint suggest that such jurisdiction exists." (Opp'n at 11, ECF No. 19.)

### III. Specific Jurisdiction

#### A. *Traditional Minimum Contacts Analysis*

"In order for a court to exercise specific jurisdiction over a claim, there must be an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State.'" *Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 137 S. Ct. 1773, 1781 (2017) (alteration in original) (quoting *Goodyear*, 564 U.S. at 919). "The inquiry as to whether specific jurisdiction exists has three parts." *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007). "First, the defendant must have purposefully

6

directed [its] activities at the forum. . . . Second, the litigation must arise out of or relate to at least one of those activities. . . . And third, if the prior two requirements are met, a court may consider whether the exercise of jurisdiction otherwise comport[s] with fair play and substantial justice." *Id.* (citations and internal quotation marks omitted).

To establish that a defendant "purposefully directed [its] activities" toward the forum state, the lawsuit "must arise out of contacts that the 'defendant *himself* creates with the forum,'" *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)), not merely out of "defendant's contacts with persons who reside [in the forum]," *id.* at 285 (citing *Int'l Shoe*, 326 U.S. at 319). "[T]he plaintiff cannot be the only link between the defendant and the forum." *Id.* at 286; *see also O'Connor*, 496 F.3d at 317 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)) (noting that "the 'unilateral activity of those who claim some relationship with a nonresident defendant' is insufficient").

  B. *Purposeful Availment Requirement*

"[W]ith respect to interstate contractual obligations, . . . parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King*, 471 U.S. at 476–77 (quoting *Travelers Health Ass'n v. Commonwealth of Va. ex rel. State Corp. Comm'n*, 339 U.S. 643, 647 (1950)). However, "[t]he fact that a non-resident has contracted with a resident of the forum state is not, by itself, sufficient to justify personal jurisdiction over the nonresident." *Mellon Bank (E.) PSFS, Nat. Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992). "The requisite contacts . . . may be supplied by the terms of the agreement, the place and character of prior negotiations, contemplated future consequences, or the course of dealings between the parties." *Id.* (citing to *Burger King*, 471 U.S. at 479).

7

Further, "[i]nformational communications in furtherance of a contract between a resident and nonresident do[] not establish the purposeful activity necessary for a valid assertion of personal jurisdiction over the nonresident defendant." *Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prod. Co.*, 75 F.3d 147, 152 (3d Cir. 1996). Communications between parties over mail, telephone, and e-mail, however, factor into a court's minimum contacts analysis. *See Grant Entm't Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 482–83 (3d Cir. 1993) (written correspondence and phone calls); *Gerald Chamales Corp. v. Oki Data Ams., Inc.*, 557 F. Supp. 2d 494, 499 (D.N.J. 2008) (in-person negotiations, phone calls, and e-mails); *Carrabba v. Morgat*, 2014 WL 229280, at *5 (D.N.J. Jan. 17, 2014) (e-mails, phone calls, and faxes). Ultimately, communications between parties, considered alongside other contacts, must reflect a "deliberate targeting of the forum" by the defendant. *Colvin v. Van Wormer Resorts, Inc.*, 417 F. App'x 183, 187 (3d Cir. 2011) (quoting *O'Connor*, 496 F.3d at 317).

C.   *Application*

The alleged contract and communications between Plaintiff and ACLS do not give rise to the requisite contacts for specific personal jurisdiction.[1] As a threshold matter, "the fact that [ACLS] has contracted with [Plaintiff,] a resident of the forum state[,] is not, by itself sufficient to justify personal jurisdiction over the nonresident." *See Mellon Bank*, 960 F.2d at 1223.

Plaintiff argues that the parties "intended the terms of their agreement to create a continuous, long-lasting relationship" because Connolly's letter explained that the prior delegate "served for over thirty years," identified as a prerequisite for holding the position "an

---

[1] The Court does not decide whether Plaintiff has alleged facts to show that the parties formed a contract. For the purpose of minimum contacts analysis, the Court assumes that the parties formed a contract.

understanding of long-term collaborative projects," and stated that the UAI's general assembly took place "biennially." (Opp'n at 17.) Plaintiff further contends that ACLS purposefully availed itself to the benefits of New Jersey by soliciting him, "a tenured professor at Princeton University, a prestigious international university in New Jersey, . . . precisely because ACLS would increase its long-term prestige by forming a continuous, multi-year affiliation with [him] and his world-famous New Jersey institution." (*Id.* at 16.)

Several cases are instructive in determining whether the agreement creates minimum contacts. In *Burger King*, the Supreme Court found the requisite minimum contacts when, despite the defendant having no physical presence in the forum state, the parties negotiated a twenty-year contract that required regular payments to the forum state and involved "exacting regulation" under the forum state's laws. 471 U.S. at 479–80. In *Remick*, the Third Circuit found that a contract created the requisite minimum contacts when a non-resident defendant solicited the plaintiff's services, the parties formed a fee agreement under the laws of the forum state, the services were conducted in the forum state, and the defendant mailed payment to the plaintiff in the forum state. 238 F.3d at 256. In *Mellon Bank*, the Third Circuit considered a contract where the defendant approached the plaintiff bank in the forum state for guaranty and suretyship agreements, which the bank signed and backed, and where defendant sent financial information, payments, and other correspondence. 960 F.2d at 1223. In that case, the court determined that, although it was a "close case," minimum contacts existed. *Id.*

By contrast, the Third Circuit found no personal jurisdiction when the defendant did not initiate the contractual relationship, but mailed a signed contract to the plaintiff in the forum state, called the forum state to negotiate a second contract, and mailed other correspondence to the forum state. *Vetrotex*, 75 F.3d at 149–152. The Third Circuit determined that this

9

correspondence was merely "informational communications in furtherance of a contract" and did not create sufficient minimum contacts for personal jurisdiction. *Id.* at 152. Another court in this district recently determined that a contract did not give rise to minimum contacts when it was governed by the laws of another state, the services under the contract would occur in another state, and the defendant did not otherwise maintain facilities, bank accounts, agents, or employees in the forum state. *G&C Fab-Con, LLC v. M&S Civil Consultants, Inc*, 2021 WL 268177, at *5 (D.N.J. Jan. 27, 2021).

Plaintiff analogizes the agreement here to *Burger King* because both cases involve a single contract that the nonresident defendant solicited and derived benefit. (Opp'n at 18–19.) However, the *Burger King* contract explicitly stated the length of the commitment, subjected the defendant to the forum state's regulations, and required payment to the forum state, *see* 471 U.S. at 479–80, while the contract here only *suggests* a long-term commitment and does not appear to subject ACLS to New Jersey regulations (*see* Compl. ¶¶ 12–21). Additionally, unlike *Remick*, where the contract services would occur in the forum state, *see* 238 F.3d at 256, Plaintiff's service as UAI delegate would occur in various international locations, not in New Jersey. (*See* Def.'s Ex. 1.) And, unlike the agreement in *Mellon Bank*, which tied the defendant to the forum state with a surety agreement, payments to the forum state, and the exchange of financial information, *see* 960 F.2d at 1223, the agreement here ties ACLS to New Jersey only through Plaintiff and his Princeton affiliation. Further, the court's characterization of the *Mellon Bank* contract as a "close case" suggests that the agreement there reached the outer limits of what the Third Circuit considers minimum contacts based on contracts. *See* 960 F.2d at 1223. Because the contract here gives rise to less contacts than that in *Mellon Bank*, it does not warrant subjecting ACLS to personal jurisdiction in a New Jersey court. *See id.*

The alleged communications between Plaintiff and ACLS are more analogous to the calls and letters that contracting parties exchange to determine the terms of an agreement, which the Third Circuit has deemed "informational communications in furtherance of a contract." *See Vetrotex*, 75 F.3d at 152; *compare Team First Consulting, LLC v. Hangliter*, 2007 WL 1302440, at *5–6 (D.N.J. Apr. 27, 2007) (finding that phone calls and emails that negotiated and clarified terms, arranged transportation, provided statements of hours worked, and attempted to change the contract terms, resulting in the alleged breach, were merely "informational communications"), *with Coni-Seal, Inc. v. O'Reilly Auto., Inc.*, 2013 WL 149611, at *7 (D.N.J. Jan. 14, 2013) (finding that the exchange of over 5,000 emails, several copies of contract drafts, and over 100 payments in New Jersey banks or lockboxes were "regular and extensive" communication such that personal jurisdiction existed over the defendant).

Unlike the extensive communications and payments in *Coni-Seal*, the communications between ACLS and Plaintiff consisted of letters, calls, and emails that negotiated and clarified the terms of the agreement, *e.g.*, start date and requirements of the position. *See* 2013 WL 149611, at *7; (Compl. ¶ 12–20.) Similarly to *Team First Consulting, LLC*, these communications also led to the alleged breach, which occurred when Connolly told Plaintiff that ACLS would choose a different delegate. *See* 2013 WL 149611, at *5–6; (Compl. ¶ 35.). Thus, the communications between ACLS and Plaintiff are "informational communications in furtherance of a contract," *Vetrotex*, 75 F.3d at 152, that do not reflect a "deliberate targeting of the forum by the defendant," *Colvin*, 417 F. App'x at 187.

Finally, while courts consider whether the non-resident defendant initiated the contract, *see Remick*, 238 F.3d at 257, the fact that ACLS contacted Plaintiff "is far from dispositive of the question of jurisdiction and purposeful availment." *See Coni-Seal*, 2013 WL 149611, at *5

11

(citing *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 151 (3d Cir. 2001)). And, despite Plaintiff's argument that ACLS solicited him to "increase its long-term prestige by forming a continuous, multi-year affiliation with [him] and his world-famous New Jersey institution," (Opp'n at 16), the alleged "offer" and "acceptance" letters do not mention Plaintiff's ties to Princeton as the basis of the agreement (*see generally* Def.'s Exs. 1, 2). Thus, Plaintiff has not established that ACLS availed itself to the "benefits" of New Jersey when soliciting him as UAI delegate. *See Remick*, 238 F.3d at 256.

In sum, the Court finds that Plaintiff has not established that the agreement between the parties creates "continuing relationships and obligations with citizens of another state" to establish the requisite minimum contacts for personal jurisdiction. *See Burger King*, 471 U.S. at 476–77. Because Plaintiff has not established minimum contacts, the Court need not analyze the remaining two steps of the specific jurisdiction analysis. *See Hanson*, 357 U.S. at 251 (explaining that minimum contacts are "a prerequisite to [the forum] [s]tate's exercise of power over [defendant]"). Further, because the Court determines that ACLS has insufficient contacts with New Jersey for personal jurisdiction, the Court need not address ACLS's 12(b)(6) motion.

## CONCLUSION

For the foregoing reasons, ACLS's Motion to Dismiss (ECF No. 13) is granted. An appropriate Order will follow.


Date: <u>October 5, 2021</u>                                          */s/ Anne E. Thompson*
                                                                                        ANNE E. THOMPSON, U.S.D.J.